**Slip Op. 22-100**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**SEAH STEEL CORPORATION,**

      **Plaintiff,**

**HUSTEEL CO., LTD., NEXTEEL CO., LTD., AJU BESTEEL CO., LTD., and ILJIN STEEL CORPORATION,**

      **Consolidated Plaintiffs,**

**and**

**HYUNDAI STEEL COMPANY and ILJIN STEEL CORPORATION,**

      **Plaintiff-Intervenors,**

**v.**

**UNITED STATES,**

      **Defendant,**

**and**

**UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., IPSCO TUBULARS INC., VALLOUREC STAR, L.P., and WELDED TUBE USA INC.,**

      **Defendant-Intervenors.**

**Before:  Jennifer Choe-Groves, Judge**

**Consol. Court No. 19-00086**

Consol. Court No. 19-00086                                                      Page 2

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand results in the 2016–2017
administrative review of the antidumping duty order on oil country tubular goods
from the Republic of Korea.]

Dated:  August 26, 2022

Jeffrey M. Winton, Michael Chapman, Amrietha Nellan, and Vi N. Mai, Winton
& Chapman PLLC, of Washington, D.C., for Plaintiff SeAH Steel Corporation.

Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S.
Hodgins, and Eugene Degnan, Morris, Manning & Martin LLP, of Washington
D.C., for Consolidated Plaintiff Husteel Co., Ltd.

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, and Kang
Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for
Consolidated Plaintiff NEXTEEL Co., Ltd. and Plaintiff-Intervenor Hyundai Steel
Company.

Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C., for Consolidated
Plaintiff AJU Besteel Co., Ltd. and Consolidated Plaintiff and Plaintiff-Intervenor
ILJIN Steel Corporation.

Hardeep K. Josan, Trial Attorney, International Trade Field Office, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y.,
for Defendant United States.  Also on the brief were Brian M. Boynton, Acting
Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke,
Assistant Director.   Of counsel on the brief was Mykhaylo Gryzlov, Senior
Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S.
Department of Commerce, of Washington, D.C.

Thomas M. Beline, Myles S. Getlan, James E. Ransdell, and Nicole Brunda,
Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor
United States Steel Corporation.

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon,
White & Case LLP, of Washington, D.C., for Defendant-Intervenors Maverick
Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc.

Roger B. Schagrin, Christopher T. Cloutier, Elizabeth J. Drake, Kelsey M. Rule, Luke A. Meisner, Paul W. Jameson, and William A. Fennell, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors Vallourec Star, L.P. and Welded Tube USA Inc.

Choe-Groves, Judge:  Plaintiff SeAH Steel Corporation ("SeAH"), Consolidated Plaintiffs Husteel Co., Ltd. ("Husteel"), NEXTEEL Co., Ltd. ("NEXTEEL"), AJU Besteel Co., Ltd. ("AJU"), and ILJIN Steel Corporation ("ILJIN"), and Plaintiff-Intervenors Hyundai Steel Company ("Hyundai") and ILJIN, (collectively, "Plaintiffs"), brought this consolidated action challenging the final results published by the U.S. Department of Commerce ("Commerce") in the 2016–2017 administrative review of the antidumping duty order on oil country tubular goods ("OCTG") from the Republic of Korea ("Korea").  See Certain Oil Country Tubular Goods From the Republic of Korea ("Final Results"), 84 Fed. Reg. 24,085 (Dep't of Commerce May 24, 2019) (final results of antidumping duty admin. review; 2016–2017); see also Issues and Decision Mem. for the Final Results of the 2016–2017 Admin. Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea (May 17, 2019), ECF No. 20-5 ("OCTG III Final Issues & Decision Memorandum" or "Final IDM").[1]

---

[1]  Citations to the administrative record reflect the public record ("PD") document numbers.

Before the Court is Commerce's remand redetermination on 2016–2017

OCTG from Korea ("OCTG III"), filed pursuant to the Court's remand order in

SeAH Steel Corp. v. United States, 45 CIT __, 513 F. Supp. 3d 1367 (2021)

("SeAH Steel" or "Remand Order").  See Final Results of Redetermination

Pursuant to Court Remand, as amended,[2] ECF No. 118-1("Remand Results").

This opinion presumes familiarity with the facts of this administrative review as

outlined in SeAH Steel, in which the Court sustained Commerce's: (1) application

of its differential pricing analysis in calculating SeAH's dumping margin; (2)

calculation of constructed value profit based on SeAH's Canadian market sales

during the prior period of review for 2014–2015; (3) exclusion of freight revenue

profit in calculating SeAH's constructed export price; and (4) inclusion of a

penalty imposed by the Korean Fair Trade Commission related to bids for orders of

line pipe in the Korean market between 2003 and 2013 in SeAH's general and

administrative ("G&A") expense ratio, but remanded Commerce's: (5) particular

market situation determination; (6) reallocation of NEXTEEL's reported costs for

non-prime products for an allocation based on actual costs; (7) adjustment to

NEXTEEL's production line suspension costs; (8) calculation of SeAH's affiliated

---

[2]  Amendment corrected inadvertent clerical errors in the dumping margins.  ECF
Nos. 112, 115 (consent motions to correct remand results); see ECF Nos. 113, 116
(orders granting consent motions).

seller's further manufacturing cost; and (9) inclusion of SeAH's inventory valuation losses in its G&A expense ratio.  See id.

On remand, Commerce reversed the particular market situation finding and removed the adjustment from SeAH's and NEXTEEL's margin calculation under protest.  See Remand Results at 7–14, 36–45.  Commerce also reversed its finding with respect to reallocation of NEXTEEL's non-prime products, relying instead on the actual costs of prime and non-prime products as reported by NEXTEEL.  Id. at 14–15, 48.  Regarding the remaining issues, Commerce provided further analysis and explanation.  See generally id.  As a result, Commerce recalculated the weighted-average dumping margins for SeAH, NEXTEEL, and the non-examined companies, which changed from 16.73 percent to 5.28 percent, 32.24 percent to 9.77 percent, and 24.49 percent to 7.53 percent, respectively.

SeAH, Husteel, NEXTEEL, Hyundai, AJU, ILJIN, and Defendant-Intervenor United States Steel Corporation ("U.S. Steel") filed comments on Commerce's Remand Results.  Cmts. of SeAH Steel Corp. on Redeterm., ECF No.

119;[3] Remand Cmts. of Consol. Pl. NEXTEEL Co., Ltd., ECF No. 121;[4] Consol.

Pl. Husteel Co., Ltd.'s Cmts. on Redeterm., ECF No. 120;[5] Remand Cmts. of

Consol. Pl. Hyundai Steel Co., ECF No. 122;[6] Remand Cmts. of Consol. Pl. AJU

Besteel Co., Ltd. and Consol. Pl. ILJIN Steel Corp., ECF No. 125;[7] U.S. Steel

---

[3] SeAH continues to disagree with Commerce's analysis on redetermination of the particular market situation issue but it supports the result, while arguing for further remand of the portion of the G&A expenses that Commerce originally allocated to its U.S. affiliate as part of the adjustment for further manufacturing costs but now allocates as selling expenses, as well as Commerce's determination to continue to include inventory valuation losses as "actual" expenses because they are reflected in SeHA's audited income statement and in the reconciliation between SeAH's normal accounting system and its audited financial statements.   SeAH Cmts. at 2–13.

[4] NEXTEEL supports the results of Commerce's redetermination of the particular market situation issue and its reversal of the adjustment in the Final Results to the costs of production reported for NEXTEEL's non-prime pipe but argues for further remand of Commerce's reclassification on remand of NEXTEEL's costs for losses associated with suspended production as still inconsistent with the Court's order of remand.   NEXTEEL Cmts. at 2–8.

[5] Husteel continues to disagree with Commerce's redetermination of the particular market situation issue but supports the result and concurs with SeAH's and NEXTEEL's comments as to their respective issues.  Husteel Cmts. at 1–2.

[6] Hyundai supports the results of Commerce's redetermination of the particular market situation issue and joins and supports SeAH's and NEXTEEL's comments as to their respective issues.   Hyundai Cmts. at 1.

[7] AJU and ILJIN also support the results of Commerce's redetermination of the particular market situation issue and join and support SeAH's and NEXTEEL's comments as to their respective issues.   AJU and ILJIN Cmts. at 1.

Corp.'s Cmts. in Partial Opp'n to Remand Redeterm., ECF No. 124.[8]   Various

parties also filed comments in reply.   Consol. Pl. Husteel Co., Ltd.'s Cmts. in

Support of Redeterm., ECF No. 129; U.S. Steel Corp.'s Cmts. in Partial Support of

Remand Redeterm., ECF No. 130; Cmts. of Def.-Intervs. Maverick Tube Corp.,

Tenaris Bay City, Inc., and IPSCO Tubulars Inc. in Support of Remand Redeterm.,

ECF No. 131; Def.'s Resp. to Cmts. Regarding Remand Redeterm., ECF No. 132;

Cmts. of SeAH Steel Corp. in Partial Support of Redeterm., ECF No. 133; Cmts.

of Consol. Pl. NEXTEEL Co., Ltd. in Partial Support of Remand Results, ECF No.

134; Cmts. of Pl.-Interv. Hyundai Steel Co. in Partial Support of Remand Results,

ECF. No. 135; Consol. Pl. AJU Besteel Co., Ltd.'s and Consol. Pl. ILJIN Steel

Corp.'s Cmts. in Partial Support of Remand Redeterm, ECF No. 136.[9]

---

[8]  U.S. Steel opposes Commerce's redetermination of the particular market situation issue and its reversal of the adjustment in the Final Results to the costs of production reported for NEXTEEL's non-prime pipe.   U.S. Steel Cmts. at 4–29.

[9]  See also Consol. Pl. Husteel Co., Ltd.'s Mot. J. Agency R., ECF No. 59; Mot. Pl. SeAH Steel Corporation J. Agency R., ECF Nos. 60, 61; Consol. Pl/Pl.-Interv. Rule 56.2 Mot. J. Agency R., ECF No. 62; Rule 56.2 Mot. J. Agency R. Consol. Pl. NEXTEEL Co., Ltd., ECF Nos. 63, 66; Rule 56.2 Mot. J. Agency R. Pl.-Interv. Hyundai Steel Company, ECF No. 64; Consol. Pl. AJU Besteel Co., Ltd.'s Rule 56.2 Mot. J. Agency R., ECF No. 65; see also Consol. Pl. Husteel Co., Ltd.'s Br. Supp. Its Mot. J. Agency R., ECF No. 59-2 ("Husteel Br.");  Br. SeAH Steel Corporation Supp. Its Rule 56.2 Mot. J. Agency R., ECF Nos. 60-1, 61-1 ("SeAH Br."); Br. Consol. Pl./Pl.-Interv. ILJIN Steel Corporation Supp. Its Mot. J. Agency R., ECF No. 62-1 ("ILJIN Br.");  Mem. Supp. Consol. Pl. NEXTEEL Co., Ltd.'s Rule 56.2 Mot. J. Agency R., ECF Nos. 63-2, 66-2 ("NEXTEEL Br."); Mem. Supp. Pl.-Interv. Hyundai Steel Company's Rule 56.2 Mot. J. Agency R., ECF No.

For the following reasons, the Court sustains Commerce's <u>Remand Results</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's negative redetermination on the existence of a particular market situation in Korea is supported by substantial evidence;

2. Whether Commerce's reallocation of NEXTEEL's reported costs for non-prime products is supported by substantial evidence;

3. Whether Commerce's adjustment to NEXTEEL's production line suspension costs is supported by substantial evidence;

4. Whether Commerce's application of SeAH's affiliated seller's general and administrative expense ratio to both further manufactured and non-further manufactured products is in accordance with the law; and

5. Whether Commerce's inclusion of SeAH's inventory valuation losses in SeAH's general and administrative expense ratio is supported by substantial evidence.

---

64-2 ("Hyundai Br."); Mem. Supp. Mot. Consol. Pl., AJU Besteel Co., Ltd., J. Agency R., ECF No. 65-1 ("AJU Br.").

## BACKGROUND

Commerce initiated the third administrative review ("OCTG III") of the antidumping duty order on OCTG from Korea for the period covering September 1, 2016, through August 31, 2017.  Initiation of Antidumping and Countervailing Duty Admin. Reviews ("Initiation Notice"), 82 Fed. Reg. 52,268, 52,271 (Dep't of Commerce Nov. 13, 2017).  Commerce selected NEXTEEL and SeAH as mandatory respondents for individual examination.  Certain Oil Country Tubular Goods From the Republic of Korea, 83 Fed. Reg. 51,442, 51,442 (Dep't of Commerce Oct. 11, 2018) (prelim. results of antidumping duty admin. review; 2016–2017).

In its Final Results, Commerce assigned weighted-average dumping margins of 32.24% for NEXTEEL, 16.73% for SeAH, and 24.49% for non-examined companies.  Final Results, 84 Fed. Reg. at 24,086; see Final IDM at 5–6.  Commerce based normal value on constructed value for NEXTEEL and SeAH because neither mandatory respondent had a viable home market or third-country market during the period of review.  Final IDM at 49.  Commerce also determined SeAH's weighted-average duty margin by applying differential pricing analysis to average-to-transaction methodology.  Id. at 60–71.

In addition, Commerce determined that a statutory "particular market situation" existed in Korea.  The determination was based on a totality-of-the-

circumstances assessment of the same four conditions that had been alleged in the first administrative review covering 2014–2015 ("OCTG I") and the second administrative review covering 2015–2016 ("OCTG II"), namely: (1) subsidies from the Government of Korea to producers of hot-rolled coil; (2) the effect on Korean domestic hot-rolled coil prices of imports into Korea of Chinese hot-rolled products; (3) strategic alliances between Korean hot-rolled coil suppliers and Korean OCTG producers; and (4) the Government of Korea's influence over the cost of electricity.  See id. at 10.

As a result of determining the existence of a particular market situation in Korea, Commerce adjusted the respondents' reported hot-rolled coil by increasing their costs of such coil by the revised AFA-based subsidy rate of 41.57% assigned such coil to POSCO.  See id. at 41–42 (citing POSCO v. United States, 43 CIT __, 378 F. Supp. 3d 1348 (2019)[10] (remanding for further proceedings consistent with POSCO v. United States, 977 F.3d 1369 (Fed. Cir. 2020) (vacating and remanding for further proceedings regarding the final affirmative determination in the countervailing duty investigation of certain cold-rolled steel flat products from Korea)); see also Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) (countervailing

---

[10]  Appeal filed, No. 19-2095 (Fed. Cir. Mar. 4, 2021).

duty investigation final affirmative determination), <u>amended by</u> 81 Fed. Reg.
67,960, 67,961 (Dep't of Commerce Oct. 3, 2016) (countervailing duty
investigation amended final affirmative determination), <u>amended by</u> 84 Fed. Reg.
23,019 (Dep't of Commerce May 21, 2019) (notice of court decision not in
harmony with amended final determination of the countervailing duty
investigation) (reducing POSCO's total AFA subsidy rate from 58.68% to
41.57%); SeAH Final Calculations Mem. at 2, PD 358 (May 17, 2019); NEXTEEL
Final Calculations Mem. at 4, PD 356 (May 17, 2019).  Commerce applied the
constructed value profit and selling expense ratios calculated for SeAH in OCTG I
to determine SeAH's constructed value profit and selling expenses here in OCTG
III.  Final IDM at 48–49.  Commerce adjusted NEXTEEL's reported costs for non-
prime products, <u>id.</u> at 91–93; calculated as G&A expenses NEXTEEL's costs
related to the suspension of two production lines, <u>id.</u> at 95–96; deducted SEAH's
reported freight revenue up to actual freight cost, <u>id.</u> at 73–74; and included
affiliate indirect selling expenses, a penalty, and inventory losses in SeAH's G&A
expenses, <u>id.</u> at 77–80, 83–84, 82–83.

     This opinion addresses Commerce's <u>Remand Results</u> and the parties'
respective comments.

## STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(iii).  The Court will hold unlawful any determination found to be

unsupported by substantial evidence on the record or otherwise not in accordance

with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews

determinations made on remand for compliance with the Court's Remand Order.

Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730, 992 F.

Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

## I.      Particular Market Situation Determination

Commerce determines antidumping duties by calculating the amount by

which the normal value of subject merchandise exceeds the export price or the

constructed export price for the merchandise.  19 U.S.C. § 1673.  When reviewing

antidumping duties in an administrative review, Commerce must determine: (1) the

normal value and export price or constructed export price of each entry of the

subject merchandise, and (2) the dumping margin for each such entry.  Id.

§ 1675(a)(1)(B), (a)(2)(A).

The statute dictates the steps by which Commerce may calculate normal

value "to achieve a fair comparison" with export price or constructed export price.

Id. § 1677b(a).  When Commerce looks to determine normal value in accordance

with 19 U.S.C. § 1677b, if Commerce concludes that it must resort to using

constructed value under 19 U.S.C. § 1677b(e), and that a "particular market

situation" exists "such that the cost of materials and fabrication or other processing

of any kind does not accurately reflect the cost of production in the ordinary course

of trade," the statute authorizes Commerce to use any other reasonable calculation

methodology.  19 U.S.C. § 1677b(e).  The origin in the statute of "particular

market situation" is its inclusion in the framework of "normal value" when the

Tariff Act of 1930 was amended by the Uruguay Round Agreements Act.  See

Pub. L. 103-465 §  224, 108 Stat. 4878 (1994);[11] cf. Trade Preferences Extension

Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) (adding the concept of a

particular market situation in the definition of the term "ordinary course of trade"

for purposes of constructed value and clarifying remedial action if Commerce finds

the existence of a particular market situation).  Congress did not, either in 1994 or

---

[11]  See also Agreement on Implementation of Article VI of the General Agreement
on Tariffs and Trade 1994, Art. 2.2 ("[w]hen there are no sales of the like product
in the ordinary course of trade in the domestic market of the exporting country or
when, because of the particular market situation or the low volume of the sales in
the domestic market of the exporting country[  ], such sales do not permit a proper
comparison, the margin of dumping shall be determined by comparison with a
comparable price of the like product when exported to an appropriate third country,
provided that this price is representative, or with the cost of production in the
country of origin plus a reasonable amount for administrative, selling and general
costs and for profits") (footnote omitted).

2015, define "particular market situation," but as observed in <u>NEXTEEL Co. v.</u>

<u>United States</u> ("<u>NEXTEEL</u>"), 28 F.4th 1226 (Fed. Cir. 2020), § 1677b(e) plainly

"identifies the factual support Commerce must provide to invoke this provision."

28 F.4th at 1234.  Congress also provided examples in adopting the Statement of

Administrative Action:

> The [Antidumping] Agreement does not define "particular market situation," but such a situation might exist where a single sale in the home market constitutes five percent of sales to the United States or where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set.  It also may be the case that a particular market situation could arise from differing patterns of demand in the United States and in the foreign market.  For example, if significant price changes are closely correlated with holidays which occur at different times of the year in the two markets, the prices in the foreign market may not be suitable for comparison to prices to the United States.

Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 822 (1994),

<u>as reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4162.  "These are all situations in which

some circumstance distorts costs so that they are not set based on normal market

forces or do not move with the rest of the market."  <u>NEXTEEL</u>, 28 F.4th at 1234.

For its <u>Final Results</u> in this administrative review, Commerce acknowledged

that the petitioners had submitted evidence of four discrete factors to demonstrate a

particular market situation in Korea: (1) subsidization of Korean hot-rolled coil

products by the Korean Government; (2) distortive pricing of unfairly-traded

Chinese hot-rolled coil; (3) "strategic alliances" between Korean hot-rolled coil

suppliers and Korean OCTG producers; and (4) distortive government control over electricity prices in Korea.  Final IDM at 23.

Considering the petitioners' evidence, Commerce first determined that the Korean steel market was "heavily subsidized."  See id. at 23–24.  However, because the evidence of record that is contemporaneous with the period of review evinced only arguable subsidies in the range of 2%, the Court concluded that Commerce's determination with respect to the Korean steel market being heavily subsidized was not reasonable and supported by substantial evidence.  SeAH Steel, 45 CIT at __, 513 F. Supp. 3d at 1391–92.

The second factor considered by Commerce in the Final Results was the effect of excess global steel capacity on the Korean market.  The Court found unreasonable Commerce's determination that a particular market situation existed in Korea due to excess Chinese steel on the global markets.  Specifically, this Court found unreasonable Commerce's implicit conclusion that such excess Chinese-exported global capacity was a phenomenon "particular" to the Korean market and "that the global glut of Chinese hot-rolled coil imports caused price distortions specific to the Korean steel market."  Id. at __, 513 F. Supp. 3d at 1393–94.

The third and fourth factors concerned "strategic alliances" and government control over electricity rates.  Because none of the documents on which Commerce

had relied appeared to pertain to the OCTG III period of review, this Court

concluded that Commerce's reasoning with respect to these factors was speculative

and unsupported by substantial evidence.  Id. at __, 513 F. Supp. 3d at 1394–96.

In its redetermination, "under respectful protest," Commerce concluded that

"the record evidence is insufficient to sustain an affirmative [particular market

situation] finding" with respect to Korea, and that "any interplay of these factors

also is insufficient" in this instance for Commerce to make an affirmative

particular market situation determination with respect to Korea and a particular

market situation adjustment.  Remand Results at 44–45.

Despite reversing its prior determination and concluding on remand that the

record did not support a particular market situation in Korea, Commerce noted its

disagreement with the Court's observations regarding the issue of overcapacity of

Chinese steel inputs.  See SeAH Steel, 45 CIT at __, 513 F. Supp. 3d at 1393 (in

which this Court held that "[t]he articles and statistics cited by Commerce do not

support a determination that the influx of Chinese hot-rolled coil is particular to

Korea because the record documents describe a global influx that affected many

other countries in addition to Korea, rather than an effect that is unique or

particular to Korea.").  Commerce contends that it has consistently recognized the

presence of a "global" overcapacity of Chinese steel products and that the global

impact can be experienced more acutely in a single market than in other countries.

The Court makes two observations with respect to the global overcapacity issue.

First, the Court notes that an "ongoing global phenomenon would not alone

constitute a deviation from the 'ordinary course of trade.'"  See NEXTEEL, 28

F.4th at 1234.  Second, in order to conclude that a single market experiences a

global phenomenon "more acutely" than other markets, the evidence of record

must not only be substantial and reasonable but clearly explained.  Commerce has

neither pointed to any evidence here, nor explained on remand or in its Final IDM

how global excess steel capacity caused by China made the market in Korea a

"particular" situation.  Given the lack of record evidence or explanation from

Commerce, the Court concludes that Commerce's simple statement that "prices in

Korea are . . . lower than they would be but for global excess steel capacity" is not

supported by substantial evidence.

In addition, Commerce inaccurately characterizes the Court's prior

evaluation of the record as an improper "rejection" of the evidence of record.  See,

e.g., Remand Results at 4, 13, 36.  The Court does not "reject" information of

record, but examines whether the evidence is substantial enough to support the

determinations claimed.  The Court's review necessarily involves "following the

path" Commerce lays out, in an attempt to discern Commerce's process of

reasoning.  See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,

463 U.S. 43 (1983).  That is not a "re-weighing" of evidence, but is an appropriate

consideration of the reasonableness of the agency's evaluation of the evidence.

Similarly, Commerce in its remand results misstates that the Court "found" the

evidence of a particular market situation to be "insufficient in this proceeding."

The Court made no such finding, it only considered the logic of Commerce's

reasoning on the record.  See, e.g., SeAH Steel, 45 CIT at __, 513 F. Supp. 3d at

1394 ("The record documents cited by Commerce relate to findings of unfair

corporate action that occurred in 2014 or earlier, and no evidence relates to unfair

corporate action or other strategic alliances during the relevant period of review

from 2016–2017 in this case.  Because none of the evidence pertains to the relevant

period of review, Commerce's purely speculative conclusions that strategic

alliances 'may have created distortions' and 'may continue to impact [hot-rolled

coil] pricing in a distortive manner during the [OCTG III] [period of review] and in

the future' are not supported by the record.") (Court's bracketing; citation omitted).

Nonetheless, the Court observes that on remand, "upon review of the

evidence on the record of this proceeding," Commerce found "that the

additional[12] evidence on the record of this underlying proceeding, which the

Court has not previously addressed and rejected [sic], as identified in the remand

---

12  There is no indication in the remand results that Commerce re-opened the record
and solicited "additional" information.

comments by the interested parties, is insufficient, on its own, to sustain a finding

of a [particular market situation] within the analytical framework that the Court

articulated in its opinion in this case."  The Court interprets this to mean that

Commerce, pursuant to the Remand Order, reconsidered the entire record, in light

of the Remand Order, and determined that the "additional" evidence "identified in

the remand comments" was insufficient to support a particular market situation

determination.  Commerce then determined that, "consistent with the Court's

opinion and under respectful protest . . . that the record evidence is insufficient to

sustain an affirmative [particular market situation] finding."  Remand Results at

44–45.

SeAH supports the result of remand of this issue.  Although it "believe[s]

that there were additional legal errors in Commerce's analysis [on remand], those

errors have now been rendered moot by Commerce's determination that the

evidence does not support its previous" particular market situation finding, and

SeAH now argues that the Court should sustain Commerce's determination.  SeAH

Cmts. at 2–3.  NEXTEEL "submits that this determination is the only possible

outcome on this issue that would be consistent with the Court's order."  NEXTEEL

Cmts. at 2.

U.S. Steel argues that in finding that a particular market situation does not

exist in Korea, Commerce "misconstrued the Court's Remand Order," "violated

the statutory framework by replacing the Court's assessment of the facts for that of

Commerce," "failed to address the entirety of the administrative record," and

"ignored evidence that undermined certain conclusions."  U.S. Steel Cmts. at 2.

The Court disagrees, as indicated above.  In a lengthy part of the Remand Results

(at pages 27–34), Commerce outlined in detail all of U.S. Steel's comments, most

of which Commerce found were an attempt to "reargue the issue of a [particular

market situation] beyond addressing the merits of Commerce's Draft Results of

Redetermination."  Remand Results at 36.  In ultimately reversing its finding of a

particular market situation and removing the particular market situation adjustment

from the margin calculations, Commerce explained that, while respectfully

disagreeing with the Remand Order, upon review of the evidence on the record of

this proceeding it found that the additional evidence on the record of this

underlying proceeding, which the Court had not previously addressed and rejected,

as identified in the remand comments by the interested parties, is insufficient, on

its own, to sustain a finding of a particular market situation within the analytical

framework that the Court articulated in its opinion in this case.

As Defendant contends, "contrary to U.S. Steel's assertion, Commerce did

not ignore record evidence or somehow limit the reconsideration to documents that

were new to the period of review.  Rather, Commerce reviewed the administrative

record as a whole in light of the fact that the Court has already found much of the

evidence insufficient to establish a particular market situation." Def.'s Resp. at 4

(citing Remand Results at 38). "Beyond this record evidence, as Commerce

explained, interested parties did not identify further evidence that is sufficient to

demonstrate the presence of a particular market situation." Id. Thus, Commerce

reversed the application of a particular market situation on remand.

> Defendant likewise contends, contrary to U.S. Steel's assertions, that

> Commerce properly concluded that there is no further evidence beyond
> that already considered and rejected by the [c]ourt in the Remand Order
> to demonstrate that government restructuring and overcapacity
> impacted the Korean market. . . . Specifically, as Commerce explained,
> interested parties were unable to demonstrate that the evidence of
> overcapacity in the Korean market "led to a situation in which, 'the cost
> of materials and fabrication or other processing of any kind does not
> accurately reflect the cost of production in the ordinary course of
> trade.'"

> Further, although Commerce found that evidence regarding
> restructuring may contribute to a particular market situation, because
> the court found the record evidence insufficient, Commerce reasonably
> concluded that any interplay among all the factors (including
> restructuring) "also is not sufficient in this instance for Commerce to
> make an affirmative [particular market situation] determination" and
> adjustment.

Id. at 5 (citing or quoting Remand Results at 13–14, 39, 45).

> A final comment on the Remand Results must also be observed at this point.

In addressing U.S. Steel's comments, Commerce states the following:

> To the extent that U.S. Steel contends that the Court's statement in the
> Remand Order that "none of the cited documents pertain to the relevant
> period of review in this case" regarding government control of the

> Korean electrical industry is factually incorrect, we find that U.S. Steel cited to certain record evidence that is contemporaneous with the POR.[ ] However, Commerce is not in a position to reverse the Court's findings. If U.S. Steel believes that the Court made factual findings that are manifestly incorrect, then U.S. Steel is free to seek reconsideration from the Court, if appropriate, or pursue an appeal to an appellate court.

Remand Results at 37 (referencing U.S. Steel's Draft Remand Comments at 4 (citing PMS Allegation at Ex. 4, Sub-Ex. 6)).

This comment seems disingenuous. The Court already noted the evidence of record to which Commerce refers on remand (i.e., "PMS Allegation at Ex. 4, Sub-Ex. 6"), see SeAH Steel, 45 CIT at __ n.11, 513 F. Supp. 3d at 1394 n.11, which is a KEPCO (Korea Electric Power Corporation) Form 20-F dated April 30, 2016, as filed with the Securities Exchange Commission. See Joint Public App'x, ECF No. 93 at 403. Commerce's Remand Results make no further attempt to explain why that retrospective document, mainly covering KEPCO's annual financial results for 2011 through 2015 (albeit with certain information to April 2016), would be "contemporaneous" with the OCTG period of review covering September 1, 2016, through August 31, 2017.[13] The Court therefore deems Commerce's claim (if

---

[13] For that matter, the administrative review was initiated on November 13, 2017. Initiation Notice, 82 Fed. Reg. at 52,271. Although not a matter on the administrative record, the Court takes judicial notice of the fact that on April 28, 2017, KEPCO filed with the SEC a Form 20-F which covers years 2012 to 2016.

indeed it is one) waived and concludes that Commerce's remand redetermination reversing its earlier particular market situation determination and removing the adjustment is supported by substantial evidence on the record.

## II.    Reallocation of NEXTEEL's Reported Costs for Non-Prime Products

In the Final Results, Commerce adjusted NEXTEEL's reported costs by assigning to the downgraded non-prime products an amount equal to their sales price, while allocating the difference between the full production cost and sales price to the production costs of prime OCTG, based on the theory that non-prime pipe cannot be used for the same application as prime products.  In light of Dillinger, in which the U.S. Court of Appeals for the Federal Circuit ("CAFC") remanded Commerce's adjustment of non-prime product costs based on recorded projected sales prices, this Court remanded Commerce's reallocation of the costs for NEXTEEL's non-prime merchandise.  See Dillinger France S.A. v. United States, 981 F.3d 1318, 1324 (Fed. Cir. 2020).  On remand, Commerce reversed the adjustment made in the Final Results and relied on the actual costs of prime and non-prime products as reported by NEXTEEL.

U.S. Steel contends that Commerce's reversal of the adjustment is inconsistent with both Dillinger and this Court's order, arguing that while the Remand Order instructed Commerce to use actual costs, it did not presuppose that

it would involve reallocation of costs.  U.S. Steel Cmts. at 30.  The Court

concludes that Commerce has not misinterpreted <u>Dillinger</u>.  Commerce explained

that in light of <u>Dillinger</u>, Commerce was required to determine the actual costs of

prime and non-prime products, and that in this case NEXTEEL neither separately

classifies prime and non-prime products, nor values these products differently for

inventory purposes, because the costs incurred in manufacturing the products are

the same.  <u>Remand Results</u> at 48 (citing NEXTEEL's June 7, 2018, SQR at SD-5).

Commerce determined that NEXTEEL calculates the cost for non-prime products

in its normal books and records in the same manner as prime products.  <u>Id.</u> (citing

NEXTEEL's Cost Verification Report at 17).  Consequently, Commerce

determined that NEXTEEL's reported costs reflect the actual costs of producing its

prime and non-prime products as required in the Remand Order.  Therefore, for

purposes of the redetermination and consistent with <u>Dillinger</u>, Commerce reversed

the adjustment made in the <u>Final Results</u> and relied on the actual costs of prime

and non-prime products as reported by NEXTEEL.

  U.S. Steel argues that the key distinction of this case and <u>Dillinger</u> is that

Commerce relied on the respondent's normal books and records in <u>Dillinger</u>,

which the CAFC determined did not accurately reflect production costs, whereas in

this case Commerce adjusted the reported costs from NEXTEEL's books and

records for its <u>Final Results</u>, <u>i.e.</u>, deviated from those books and records.  U.S.

Steel Cmts. at 26.  That, however, is a distinction without a difference.  The

allocation in Dillinger, which the CAFC rejected, was based on the respondent's

normal books and records and was substantially similar to Commerce's Final

Results adjustment in this case, which Commerce reversed on remand.  Remand

Results at 14.  The Court also notes Commerce's disagreement that departing from

NEXTEEL's normal books and records was justified in this instance.  See Def.'s

Reply at 6–7.

Anticipating such response, U.S. Steel argues that section 1677b(f)(1)(A)

does not require Commerce to use NEXTEEL's normal books and records in all

circumstances, but only provides that Commerce will normally do so.  But, as

Defendant also notes, while U.S. Steel's point may be true, on remand Commerce

simply reversed an adjustment to the reported cost after the Court found that the

adjustment, which U.S. Steel favors, did not reflect actual costs.  See id. at 7; see

Remand Results at 14.

U.S. Steel also advances several arguments that range from asserting that

NEXTEEL's reported costs are inconsistent with Korean GAAP to contending that

NEXTEEL's non-prime products are out of scope products that should be treated

as scrap.  U.S. Steel Cmts. at 26–29.  But, as Defendant notes, these arguments do

not provide a basis for adjusting NEXTEEL's reported costs of non-prime products

equal to "the amount it is able to recoup through the sale of such non-prime

product (i.e., its market price)." See Def.'s Resp. at 7 (quoting U.S. Steel Cmts. at

29).  In Dillinger, the CAFC followed its earlier decision in IPSCO, Inc. v. United

States, 965 F.2d 1056 (Fed. Cir. 1992), which held a method that "calculate[ed]

costs for both limited-service and prime products on the basis of their relative

prices" to be "an unreasonable circular methodology" because it "contravened the

express requirements of the statute which set forth the cost of production as an

independent standard for fair value." See id. (quoting Dillinger, 981 F.3d at 1322

(quoting IPSCO, 965 F.2d at 1061)).  "Accordingly, Dillinger, as interpreted by

this Court in the Remand Order, specifically precludes the adjustment of

NEXTEEL's reported costs that U.S. Steel seeks, i.e., assigning to non-prime

products the cost that is equal to their market price." Id. at 7–8.

The Court concludes that substantial evidence supports Commerce's

determination on this issue.

### III.   Adjustment for NEXTEEL's Production Line Suspension Costs

Commerce's determination to include the cost of suspending (or idling)

production at one of NEXTEEL's facilities as part of NEXTEEL's G&A expenses

was remanded by this Court for clarification or reconsideration.  SeAH Steel, 45

CIT at __, 513 F. Supp. 3d at 1040.  The Court explained in its prior opinion that

Commerce's Final Results did not explain what was deficient about NEXTEEL's

records that would warrant departing from the statutory preference for determining costs according to an exporter's or producer's own records.  <u>Id</u>.

On remand, Commerce provided further explanation of why it believed reclassification of NEXTEEL's reported losses was reasonable and why NEXTEEL's allocation of labor and overhead costs relating suspended lines to the cost of goods sold in its records was distortive.  <u>Remand Results</u> at 17.  Commerce explained that NEXTEEL suspended production on slitting (<u>i.e.</u>, used for skelp production) and threading (<u>i.e.</u>, used for OCTG production) lines for limited periods during the period of review, and that the costs related to these suspended lines were not assigned to products but were transferred directly to cost-of-goods-sold in accordance with NEXTEEL's normal accounting treatment.  However, NEXTEEL did not account for these costs in the reported costs of producing OCTG, as these costs are unrelated to production activities.

Commerce detailed that its normal practice is to include routine shutdown expenses, <u>e.g.</u>, maintenance shutdowns, in a respondent's reported costs, and to associate those costs with the products produced on those lines, <u>i.e.</u>, as part of cost of manufacturing.  In the underlying review, Commerce determined that the suspended loss was not related to a routine shutdown but related to NEXTEEL's suspension of production on certain lines for an "extended period of time" throughout fiscal years 2016 and 2017.  <u>See, e.g.</u>, <u>Remand Results</u> at 5, 16, 18.

Commerce reasoned that, unlike a routine maintenance shutdown, once a

production line is suspended or idled, it no longer relates to ongoing production:

> A company can suspend production lines for numerous reasons; for
> example, the company has low current sales and no necessity to
> inventory the product produced on those production lines, or a company
> may suspend a production line while it assesses whether it should
> permanently close the production line. Regardless of the reason for the
> suspension, in contrast to the routine maintenance shutdowns, there are
> no longer products produced on those production lines or current
> intentions to produce products on those lines that can bear the burden
> of the costs associated with those production lines.[ ] However, the
> suspended lines, akin to idled assets, remain available to the company
> pending resumption of production on those lines, and represent excess
> capacity held by the company. We consider the cost of holding idle
> assets a period cost that relates to the general operations of the company
> as a whole, and not to the manufacture of specific products. Our
> practice has been to include depreciation on idle assets as part of the
> calculation of the G&A expense ratio.

Id. at 16–17.

Regarding NEXTEEL in particular, Commerce determined that the company

did not allocate the labor and overhead costs related to the suspended lines to its

pipe products in its normal books and records but recorded the suspension loss

directly to cost of goods sold. Id. at 17. Commerce considered that this had the

effect of "inflating" the cost of goods sold figure used in the allocation of G&A

expenses—in other words, "this suspended loss was excluded from the reported

costs (i.e., not included in either per-unit COM or in G&A expense)." Id. (citing

NEXTEEL's June 7, 2018, SQR at SD-8, and NEXTEEL's Cost Verification

Report at 2, 12–13).  Commerce's solution was to include (or re-allocate) these non-product costs as G&A expenses.  See id.

NEXTEEL argues that Commerce's reliance on Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2014–2015, 81 Fed. Reg. 91,120 (Dep't of Commerce Dec. 16, 2016) and Certain Polyester Staple Fiber from Korea: Final Results of the 2005–2006 Antidumping Duty Administrative Review ("Fiber from Korea"), 72 Fed. Reg. 69,663 (Dep't of Commerce Dec. 10, 2007), is inapposite and not dispositive of the issue here.  In those cases, NEXTEEL contends, the question was whether depreciation associated with "idled assets" should be included in G&A expenses or excluded altogether from respondents' costs, and Commerce distinguished whether the asset or facility had been permanently shut down, in which instance Commerce indicated that excluding the costs would be appropriate.  See, e.g., Fiber from Korea, 72 Fed. Reg. 69,663, and accompanying issues and decision memorandum at cmt. 8.  NEXTEEL complains that in neither case did Commerce appear to address the question of whether costs that had been recorded directly as cost of goods sold consistent with GAAP were appropriately reclassified as G&A expenses.  NEXTEEL also complains that Commerce makes inconsistent references to the suspension as having been "for limited periods during the period of review" as well as having been "for an extended period of time" within the same

paragraph but does not articulate a standard for differentiating between routine

shutdowns (which, in Commerce's view, do not warrant cost reclassification) and

more prolonged shutdowns (a situation which Commerce views as appropriate to

reclassify costs).  NEXTEEL Cmts. at 3–4 (quoting Remand Results at 15, 54).

The Court concludes that Commerce's explanation on remand of its

adjustment is reasonable.  In a recent case, the Court sustained substantially

identical treatment by Commerce of NEXTEEL's suspended losses.  See Husteel

Co. Ltd. v. United States ("Husteel"), 45 CIT __, __, 520 F. Supp. 3d 1296, 1301

(2021) ("The court cannot say that it is unreasonable for Commerce, in its

expertise, to determine that a company's attribution of costs relating to the

extended suspension of certain non-subject product lines as costs of goods sold

results in an inaccurate reflection of the general expenses incurred in the

production of subject merchandise.").  In the present circumstance, as NEXTEEL

acknowledges, it is sufficient for the purpose of this case that Commerce

determined that "the shutdown started before the POR and continued after the

POR."  Remand Results at 54.

Taken as a whole, Commerce's explanation, as elucidated by Defendant, is

reasonable and consistent with Husteel Co. Ltd. v. United States, 45 CIT __, 520 F.

Supp. 3d 1296 (2021).  Substantial evidence supports Commerce's determination

on this issue.

## IV.   SeAH's Further Manufacturing Costs

The statute, 19 U.S.C. § 1677a(d)(2), requires the deduction of "the cost of

any further manufacture or assembly" from constructed export price.  During the

period of review, SeAH's U.S. affiliate Pusan Pipe America Inc. ("PPA") imported

OCTG pipe from SeAH, which PPA either subjected to further manufacture

through third-party tolling or resold without further processing.  In the Final

Results, Commerce attributed PPA's G&A expenses proportionally by applying

PPA's reported general expense ratio as follows: (1) for the further manufactured

products, Commerce applied PPA's general expense ratio to the total cost of the

further manufacturing plus the cost of the imported OCTG that was further

manufactured, and included these general expenses as "further manufacturing" cost

under 19 U.S.C. § 1677a(d)(2); and (2) for products not further manufactured,

Commerce applied PPA's general expense ratio to the cost of producing the

imported OCTG and included these expenses as "indirect selling" under 19 U.S.C.

§ 1677a(d)(1)(D) (i.e., "any selling expenses not deducted under subparagraph (A),

(B), or (C)").  See Final IDM at 79.

The Court sustained the application of PPA's general expense ratio to the

cost of the imported OCTG that was not further manufactured.  However, with

regard to the imported OCTG that was further manufactured, the Court concluded

that the cost of the imported OCTG itself was not a "cost incurred for further

manufacture" under 19 U.S.C. 1677a(d)(2); therefore, Commerce's application of

PPA's general expense ratio to the cost of the imported OCTG, and the deduction

of these general expenses as further manufacturing costs under the statute, was not

in accordance with the law.  In other words, the application of PPA's G&A

expense ratio to the cost of the imported OCTG pipe essentially, and

impermissibly, treated the cost of importation as a "further manufacturing" cost,

and the Court remanded to Commerce for recalculation.  SeAH Steel, 45 CIT at __,

513 F. Supp. 3d at 1043, 1046.

On remand, Commerce continued to determine, consistent with its normal

practice, that general expenses relate to the entire activities of the company and

therefore should be allocated proportionally to those activities.  Id. (citing Welded

Line Pipe from the Republic of Korea: Final Determination of Sales at Less Than

Fair Value, 80 Fed. Reg. 61,366 (Dep't of Commerce Oct. 13, 2015) (Line Pipe

from Korea), and accompanying IDM at cmt 20, and Certain Hot-Rolled Steel Flat

Products from Brazil: Final Determination of Sales at Less Than Fair Value and

Final Affirmative Determination of Critical Circumstances, in Part, 81 Fed. Reg.

53,424 (Dep't of Commerce Aug. 12, 2016) (Hot-Rolled Steel from Brazil), and

accompanying IDM at cmt 5).  Further, as Defendant notes, the Court has been

clear that the statute requires deduction of both further manufacturing costs and

selling expenses.  Def.'s Resp. at 20–21 (citing U.S. Steel Corp. v. United States,

34 CIT 252, 256, 712 F. Supp. 2d 1330, 1336 (2010); SeAH Steel, 45 CIT at __,

513 F. Supp. 3d at 1042 ("Commerce must deduct both the selling expenses and

the cost of further manufacture from the price used to determine constructed export

price.")).  Bearing that in mind, Commerce adopted a revised approach that does

not deduct the cost of PPA's imported OCTG pipe as a further manufacturing

expense.  See Remand Results at 20.  For the further-manufactured OCTG,

Commerce applied PPA's G&A expense ratio to the total cost of further

manufacturing and included the amount as "further manufacturing" under 19

U.S.C. § 1677a(d)(2).  Id. at 23.  Commerce also applied PPA's G&A expense

ratio to the cost of production of the imported OCTG, whether further

manufactured or not, and included the amount as "indirect selling expenses" under

19 U.S.C. § 1677a(d)(1)(D).  Id.  Commerce explained that "[t]his revised

classification both satisfies the requirements of the statute and allows for a logical

and full accounting of the company's general expenses.  It also complies with the

Court's remand instructions to recalculate SeAH's further manufacturing costs in

accordance with the law."  Id.; see also id. at 58–59.

     SeAH contends that the statute does not permit deduction from the

constructed export price of "any and all expenses" including "G&A expenses

incurred by the U.S. affiliate among them."  SeAH Cmts. at 5.  The argument

misses the mark.

G&A expenses are costs that support a company's overall operations.  They
are day-to-day costs that a business must incur to continue to exist or operate (e.g.,
property taxes, business licenses, insurance, accounting/auditing services and
personnel costs, etc.).  Consequently, these costs that enable a company to continue
to operate are indirectly related to those operations.  If a company only resells
goods, then its G&A expenses are appropriately considered selling expenses.  See
SeAH Steel, 45 CIT at __, 513 F. Supp. 3d at 1044.  Likewise, if a company both
resells and manufactures, those expenses logically support both activities.  Here,
PPA both resells purchased goods and provides for the further manufacture of
purchased goods prior to reselling them.  If PPA had only resold purchased goods,
the G&A expenses would have been recognized as selling expenses, but because
PPA arranges for the further manufacture of certain purchased goods, SeAH argues
that Commerce cannot transform into purely "selling" expenses the G&A expenses
that support the company's overall operations (which, for PPA, are both reselling
and further manufacturing) and therefore Commerce should recognize in its
calculations only the amounts allocated to PPA's further manufacturing as
allowable deductions.

The language of 19 U.S.C. § 1677a(d)(1)(D), covering the adjustments to
constructed export price, is broadly written to include "any selling expenses not
deducted" under the other subparagraphs.  The Statement of Administrative Action

also confirms a broad view of 19 U.S.C. § 1677a(d)(1)(D) as providing for the

deduction of any indirect selling expense from constructed export price.  See

Statement of Administrative Action, H.R. Doc. 103-316, vol. 1 (1994) ("SAA") at

824.  The SAA defines "indirect selling expenses" as "expenses which do not meet

the criteria of 'resulting from and bearing a direct relationship to' the sale of the

subject merchandise, do not qualify as assumptions, and are not commissions."  Id.

  In calculating indirect selling expenses, Commerce "generally will include

the G&A expenses incurred by the United States selling arm of a foreign

producer," a practice that has been sustained by the court.  See Aramide

Maatschappij V.o.F. v. United States, 19 CIT 1094, 1101, 901 F. Supp. 353, 360

(1995); see also NEXTEEL Co. v. United States, 44 CIT __, __, 450 F. Supp. 3d

1333, 1346 (2020) ("Commerce's explanation of its accounting treatment

methodology for classifying PPA's G&A expenses as indirect selling expenses and

deducting the expenses when calculating constructed export price is reasonable and

responsive to the court's request for clarification.").  Here, in explaining its

treatment of all of PPA's G&A expenses as indirect selling expenses, Commerce

found significant the fact

> that PPA is not performing further manufacturing on its own and does
> not maintain any production facilities for further manufacturing.
> Rather, these processes are performed by tollers, and SeAH's
> involvement in further manufacturing is perfunctory in nature and is
> limited to paying a processing fee, which we accounted for as a further

> manufacturing expense.  Apart from paying the processing fee to the
> tollers, which we accounted for, SeAH is predominantly a selling entity
> and, thus, it is reasonable to treat <u>the portion</u> of its G&A expenses that
> are related to the cost of the imported products as selling expenses.

<u>Remand Results</u> at 58 (citing SeAH Feb. 27, 2018 EQR at 3–4) (emphasis added).

SeAH contends that Commerce's decision is inconsistent with a recent

determination in a review of <u>Heavy Walled Rectangular Pipe from Korea</u>, which

SeAH claims constitutes an established practice of distinguishing between G&A

expenses and selling expenses.  SeAH Cmts. at 7.  That proceeding concerned a

respondent's argument that the salary of the company's CEO should be allocated

between indirect selling expenses ("ISE") and G&A expenses.  In <u>Heavy Walled</u>

<u>Rectangular Pipe from Korea</u>, Commerce rejected the proposal to allocate

"equally" between ISE and G&A expenses because the CEO's duties included

overseeing production, investment, and general operations of the company, and

concluded the salary was appropriately considered completely as a G&A expense.

See <u>Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea</u>,

86 Fed. Reg. 35,060 (Dep't of Commerce July 1, 2021), and accompanying Issues

and Decision Mem. ("<u>CSP from Korea</u>") at 46–47 (cmt. 6).

The situation in that proceeding is distinguishable from the present

circumstance.  The issue here is how to treat G&A expenses of a U.S. importer,

which primarily serves as a selling arm of a foreign producer, concerning which

Commerce "generally will include the G&A expenses incurred by the United States selling arm of a foreign producer," a practice long sustained by the court. See, e.g., Aramide, 19 CIT at 1101, 901 F. Supp. at 360.[14]  SeAH is essentially arguing that PPA should be treated the same as producers and/or companies performing further manufacturing (which have production facilities, factory overhead and other significant expenses associated with manufacturing), when PPA is not itself performing the further manufacturing.  However, the Court's role is to examine the record to evaluate whether Commerce's determination is supported by substantial evidence.  On this issue, the determination is supported.

SeAH has not identified any statutory language that prohibits Commerce from treating G&A expenses of PPA, a selling arm of SeAH in North America, as indirect selling expenses.  PPA is a selling arm of SeAH without production facilities, and Commerce determined that its role in further manufacturing is "perfunctory in nature."  Remand Results at 58.  The Court does not conclude that Commerce's treatment on remand of the G&A expenses for SeAH's U.S. affiliate

---

[14]  Moreover, in Heavy Walled Rectangular Pipe from Korea, Commerce expressly rejected the argument that its determination was inconsistent with its determination in OCTG from Korea.  CSP from Korea at 47.  Commerce explained that "each administrative review is a separate segment of proceedings with its own unique facts" and that "although the facts in OCTG from Korea may differ from those in the instant case, in determining whether particular items may be included in G&A, Commerce followed its practice by reviewing the nature of the item and its relation to the general operations of the company."  Id.

was improper.  In view of Commerce's explication, the Court upholds Commerce's

determination as supported by substantial evidence on the record.

### V.       Inclusion in SeAH's G&A Expense Ratio of Inventory Revaluation Losses

Considering Commerce's determination in the <u>Final Results</u> of inventory

valuation losses among SeAH's financial statements, the Court previously found it

"unclear from the record or from Commerce's explanation whether the inventory

valuation losses related to SeAH's raw materials and work-in-progress were

expenses." <u>SeAH Steel</u>, 45 CIT at __, 513 F. Supp. 3d at 1045.  The Court held

that Commerce failed to cite record evidence "demonstrating that the inventory

valuation losses became realized costs, which it seems would occur only if the raw

materials and work-in-process were sold" and, thus, remanded this issue for further

explanation or reconsideration.  <u>Id.</u> at __, 513 F. Supp. 3d at 1045–46.  On remand,

Commerce provided further explanation for including SeAH's raw material work-

in-process inventory valuation losses in its G&A expense ratio, with additional

details and citations to record evidence that more clearly demonstrate that the

inventory valuation losses are indeed recognized as actual in SeAH's normal books

and records.  <u>Remand Results</u> at 24–27.

Commerce explained on remand that inventory valuation gains and losses

"are recognized by companies, including SeAH, in their normal books and records

in compliance with GAAP." Id. at 25.  GAAP "principles require the restatement

of currently held inventory values to the lower of their cost or net realizable value."

Id.  Commerce stated that the "purpose of this rule, which is also a part of U.S.

GAAP and International Accounting Standards, as well as many other national

accounting systems, is to comply with a basic tenet of accounting—the "matching"

principle." Id.  "In the context of inventory valuation," Commerce explained, "the

matching principle requires that a loss of inventory value during a given

accounting period be charged against the revenues of the period in which it

occurs." Id. at 25–26.  Commerce examined SeAH's audited financial statements

and concluded that "SeAH follows the lower of cost or net realizable value policy

for its inventories and that any such losses in inventory value are recognized as a

current expense on the income statement." Id. at 26.  Thus, Commerce determined

that "the key record evidence that SeAH's inventory valuation losses are actual and

not imputed expenses is found in SeAH's audited income statement and in its

reported reconciliation of the total costs from the income statement to the total

reported costs." Id.

Although the inventory loss is not a separate line item in the financial

statements, Commerce explained that it is included as a component of the

company's total costs in the overall reconciliation worksheets and supporting

documentation. Id.  Commerce further explained how the inventory valuation loss

can be traced from SeAH's normal books and records to its audited financial

statement, and confirmed that "the inventory valuation losses were recognized as

expenses on SeAH's 2017 audited income statement." Id.  Because the statute

directs Commerce to rely on a company's GAAP-based normal books and records

unless such books and records do not reasonably reflect the costs associated with

the production and sale of the merchandise, it was reasonable for Commerce to

account for these costs in its dumping calculations.  19 U.S.C. § 1677b(f)(1)(A).

Rather than refute this record evidence, SeAH contends that Commerce

allegedly conceded "that the losses in question are not realized, and that its

inclusion of the [l]osses in its cost calculation was based on a demonstrably false

assumption."  SeAH Cmts. at 6.  The Court disagrees.  Commerce determined that

"the inventory valuation losses are indeed recognized as actual expenses in SeAH's

normal books and records."  Remand Results at 26.  Commerce explained that

"GAAP seeks to ensure that a company's balance sheet is not overstated and that

the current period net profit or loss is appropriately charged for any significant

changes in the value of the assets held by the company" and that, in Commerce's

view, an inventory revaluation of losses is "similar to a company's recognition of

bad debt expenses, translation gains or losses, or impairment losses, all of which

reflect changes in the values of assets or liabilities held by a company at a period

end." Id. at 64.  Thus, consistent with its home country GAAP, SeAH recognized

various estimated valuations as actual costs in its own audited financial statements,

which (for example) resulted in bad debt expenses, depreciation expenses, etc.,

including the inventory valuation losses that are in question, on its profit and loss

statement.  See Def.'s Resp. at 16–17 (citing SeAH's supplemental section A

response dated June 8, 2018, at Ex. SA-2-B, SeAH 2017 audited financial

statements at note 4 (showing allowance for doubtful accounts), note 7 (showing

loss on valuation on inventories), note 8 (showing accumulated depreciation), note

24 (showing depreciation expense, bad debt expense, etc.)).

        To demonstrate an error in Commerce's treatment of its inventory valuation

losses, SeAH must demonstrate that its GAAP compliant audited financial

statements do not reasonably reflect the costs associated with the production and

sale of the merchandise.  See 19 U.S.C. § 1677b(f)(1)(A).  Because the costs at

issue are reflected in SeAH's own GAAP-based financial statements, SeAH

essentially argues that its own books are unreasonable and must be set aside

because they result in a double-counting of costs.  See SeAH Cmts. at 9

("Commerce also attempted to refute SeAH's contention that the inclusion of

inventory-valuation losses in the calculated costs resulted in a double-counting of

SeAH's actual cost of materials.").  To the contrary, however, the Court observes

that Commerce does not appear to have double-counted.  See Remand Results at

64 ("We also disagree that following a company's GAAP-based normal books and

records results in a double-counting of raw material and [work-in-progress]

consumption costs.").

     Defendant explains that SeAH's argument hinges on a faulty assumption

that the total costs of manufacturing assigned to finished goods (which include the

full value of raw material costs consumed during the production) include the same

costs as SeAH's G&A expenses (which include the net inventory valuation losses

from the profit and loss statement that recognize the net change in the value of

inventories on hand, i.e., the inventory that has not been consumed during the

production).  Defendant argues that "SeAH improperly conflates two distinct types

of expenses: the loss associated with the inventory on hand (i.e., inventory that has

not been consumed in production) and the cost of the raw materials and semi-

finished goods consumed during the production process."  Def.'s Resp. at 17–18.

     In its comments in the administrative proceeding, SeAH attempted to

demonstrate unsuccessfully the alleged double-counting through a hypothetical

example, which Commerce addressed.  Remand Results at 65.  Specifically,

Commerce explained why SeAH's hypothetical example demonstrated the

opposite—that is, it shows why the net cost of production, i.e., the TOTCOM

assigned to finished goods (including the full value of raw material costs consumed

during production) plus the G&A expenses (including the net inventory valuation

losses from the profit and loss statement that recognize the net change in the value

of inventories on hand), do not double-count costs.  Id.  But, having presented a

hypothetical example, SeAH now faults Commerce for elaborating on hypothetical

facts, which SeAH claims differ from how its accounting system works.  SeAH

Cmts. at 12–13 (claiming that Commerce misunderstood its accounting).  The

Court does not interpret Commerce's response to SeAH's hypothetical, however,

as intending to imply that SeAH consumed raw materials at the lower value, but

only to demonstrate why the net of the two categories of expenses (i.e., TOTCOM

plus G&A expenses or cost of production) would not double-count costs.  The

Court notes that GAAP's intention with the lower-of-cost-or-market policy is for a

company to immediately recognize a loss when an inventoried asset falls below its

net realizable value, and therefore "match" it to the current period activity.[15]

Commerce's G&A expense calculations are based on the current period in which

the inventory valuation losses in value of inventory on hand was recognized by

---

[15]  See, e.g., Financial Accounting Standards Board (FASB), Standard 330-10-35-
2: "The cost basis of recording inventory ordinarily achieves the objectives of a
proper matching of costs and revenues.  However, under certain circumstances cost
may not be the amount properly chargeable against the revenues of the period in
which it occurs.  A departure from cost is required in these circumstances because
cost is satisfactory only if the utility of the goods has not diminished since their
acquisition; a loss of utility shall be reflected as a charge against the revenues of
the period in which it occurs.  Thus, in accounting for inventories, a loss shall be
recognized whenever the utility is impaired . . ." (emphasis added) (available at
https://asc.fasb.org/section&trid=2127015).

SeAH in its audited profit and loss statement; therefore, Commerce likewise included the inventory valuation losses in its calculation SeAH's G&A expenses.

Contrary to SeAH's assertions, the Court agrees with Commerce that there is no double-counting because there are two separate and distinct costs that are being captured here: the product-specific TOTCOM reported by SeAH reflects the historical costs of the raw materials and semi-finished goods that were consumed in production of finished goods, while the fiscal year G&A expenses reflect the net loss, as recorded on the profit and loss statement, in the value of inventory that was on hand (i.e., not consumed) at the end of the year, a recognition that is required under the home country GAAP followed by SeAH. This recognition of loss in inventory values is no different from accounting entries that recognize the depreciation of fixed assets, bad debt expenses related to current accounts receivables, or asset impairment losses, all of which seek to conservatively allocate the loss in asset values to the production or revenues generated in the period in which the losses occurred.

Finally, the Court concludes that Commerce does not appear to have misunderstood SeAH's accounting in its normal books and records. To demonstrate the alleged misunderstanding, SeAH offers a four-step mini tutorial on its accounting of inventory-valuation losses. SeAH Cmts. at 10–11. However, in doing so, SeAH provides only a balance sheet perspective and omits the

corresponding accounting entries that affect the company's profit and loss statement.[16]  See id.  In accordance with GAAP, Commerce explained that SeAH's normal books and records restate the inventory balances on SeAH's balance sheet on a quarterly basis so that they conservatively reflect the lower of cost or net realizable values.  At the same time, Commerce determined that SeAH records on its income statement the associated net gain or loss that is the result of this revaluation.  See Remand Results at 25–26; IDM at 83; see also SeAH Cost Verification Report at 4, PR 316.  The Court concludes that Commerce's determination that there is no double-counting of expenses because the net inventory losses recorded on SeAH's GAAP-based audited income statement are periodic expenses related to a change in the value and future utility of currently held inventory and are not related to the inventory consumed in current production, is reasonable and supported by substantial evidence.

The Court concludes that Commerce properly included SeAH's inventory valuation losses in its G&A expense ratio and that substantial evidence supports Commerce's determination.

---

[16]  Defendant contends that SeAH's tutorial does not reflect double-entry accounting.  "For example, when SeAH records an inventory valuation loss (which is discussed in step 3 of SeAH's mini tutorial), there is a corresponding debit to current period expenses."  Def.'s Resp. at 19 (citation omitted).

Consol. Court No. 19-00086                                              Page 46

## CONCLUSION

In view of the foregoing, judgment will be entered sustaining the <u>Remand Results</u>.


                                              ___/s/ Jennifer Choe-Groves___
                                              Jennifer Choe-Groves, Judge

Dated: ____August 26, 2022_____
        New York, New York